IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH M. HARPER, | ) | Case No. 1:20-cv-1304 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Elizabeth Harper, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB"), disabled widow's benefits ("DWB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards by not adequately explaining why he discounted Harper's subjective symptom complaints regarding her migraine headaches, I recommend that the Commissioner's final decision denying Harper's applications for DIB, DWB, and SSI be vacated and that Harper's case be remanded for further consideration.

## I.    Procedural History

On August 29, 2014, Harper applied for DIB.  (Tr. 333-39).[1]  On September 19, 2014, she applied for SSI.  (Tr. 340-45).  And on October 8, 2014, she applied for DWB.  (Tr. 346-54).

---

[1] The administrative transcript appears in ECF Doc. 11, ECF Doc. 11-1, ECF Doc. 11-2, ECF Doc. 11-3, ECF Doc. 11-4, ECF Doc. 11-5, ECF Doc. 11-6, and ECF Doc. 11-7.

Harper alleged that she became disabled on June 20, 2014, due to: "1. [h]eadaches; 2. [e]asily confused; 3. memory issues; 4. brain aneurysm; 5. depression; 6. anxiety/panic; 7. high blood pressure; [and] 8. fatigue."  (Tr. 333, 340, 349, 378).  The Social Security Administration denied Harper's applications initially and upon reconsideration.  (Tr. 78-125, 129-60, 164-79).  ALJ Joseph G. Hajjar heard Harper's case on October 24, 2018 and denied the claims in a February 25, 2019 decision.  (Tr. 15-26, 35-76).  On April 22, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 3-5).  On June 16, 2020, Harper filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Harper was born on June 16, 1961 and was 53 years old on the alleged onset date and the date last insured.  (Tr. 18, 78, 333, 340, 349).  Harper graduated from high school in 1979.  (Tr. 379).  She had past relevant work as a department manager and portrait photographer.  (Tr. 24, 69-70, 380).

### B.  Relevant Medical Evidence

#### 1.  Physical Impairment Evidence Re: Chronic Migraines

On June 20, 2014, Harper presented to the Ashtabula County Medical Center's[2] Emergency Department with severe headache.  (Tr. 530).  Earlier that day, she developed severe explosive diffuse headache that later localized to the left side, associated with nausea, photophobia, and neck stiffness.  (*Id.*).  A CT scan showed a grade III subarachnoid hemorrhage ("SAH") with localized clot in the left sylvian fissure, and she was transferred to the Cleveland Clinic.  (*Id.*).  She reported a history of chronic migraines.  (*Id.*).  Harper was then referred for neurological treatment under

---

[2] Ashtabula County Medical Center is an affiliate of the Cleveland Clinic Foundation.  *See e.g.*, Tr. 4257.

Peter Rasmussen, M.D.  (Tr. 535-36).  On June 21, 2014, a CT scan of Harper's brain showed large left middle cerebral artery ("MCA") aneurysm.  (Tr. 476-77).  She underwent coil embolization of the aneurysm, with near complete occlusion.  (Tr. 499-502).  Harper was discharged on July 17, 2014 in stable condition.  (Tr. 712).

On September 3, 2014, Harper reported to Dr. Rasmussen for a follow up on her aneurysm. (Tr. 829).  She indicated that she felt better, but suffered symptoms of headaches, occasional nausea, and decreased vision.  (*Id.*).  Dr. Rasmussen's impression was that Harper was doing well with gradual improvement.  (Tr. 830).  He gave a primary diagnosis of SAH and a diagnosis of "[m]igraine headache without aura."  (Tr. 831).  And he prescribed ibuprofen for the pain.  (*Id.*).

On December 9, 2014, a follow-up angiogram revealed gross recurrence of the aneurysm. (Tr. 3174-75).  And a second coil embolization was scheduled.  (Tr. 3129).  During a pre-operation visit to the Cleveland Clinic on December 31, 2014, Harper reported dull, intermittent daily head pain ("6 on a scale of 0-10").  (Tr. 3132).  She was prescribed Fioricet for her headaches.  (Tr. 3134).  On January 6, 2015, Harper underwent a second coil embolization, resulting in "good packing of the aneurysm."  (Tr. 3147-49).

Meanwhile, Harper began, on December 30, 2014, seeing Suk K. Choi, M.D., as her primary care physician.  (Tr. 3132, 3384-89).  On January 20, 2015, Harper reported throbbing, continuous head pain with a pain score of "6," and Dr. Choi continued her medication.  (Tr. 3376, 3378, 3380).  Harper reported headaches on February 2, 2015, and daily headaches on March 26, 2015, and her Fioricet prescriptions were renewed.  (Tr. 3367-68, 3370, 3372-74).  Between January and April 2015, Dr. Choi did not diagnose Harper with chronic migraines but with SAH, though he listed migraine headache without aura as among her present problems.  (Tr. 3369, 3371, 3374-75, 3379, 3381, 3383).

On April 8, 2015, Harper presented to Dr. Choi with hypertension, which Dr. Choi noted had associated symptoms of headaches.  (Tr. 3361).  Dr. Choi listed SAH and migraine headache without aura as among Harper's diagnoses, with SAH as the primary diagnosis.  (Tr. 3362-63).  For both, he prescribed Fioricet, aspirin, and a blood test.  (*Id.*).  On April 29, 2015, Harper presented with headaches, which Dr. Choi noted was a chronic problem that had been followed at the Cleveland Clinic, with associated symptoms of malaise/fatigue and shortness of breath.  (Tr. 3354).  Dr. Choi ordered for Harper's SAH and brain aneurysm a lumbar X-ray.  (Tr. 3358).  The X-ray was performed on June 10, 2015, showing degenerative disc disease L5-SI and minimal retrolisthesis of L5.  (Tr. 3390).

On June 25, 2015, Harper presented to Dr. Choi with, among other things, back pain and headaches, with associated shortness of breath.  (Tr. 3350).  She was diagnosed with low back pain and SAH and instructed to follow up with the Cleveland Clinic for her SAH.  (Tr. 3352-53).  Harper returned to Dr. Choi on August 12, 2015, for her headaches, with associated symptoms of malaise/fatigue.  (Tr. 3338-39).  She complained of chronic, continuous, and aching pain on her "back headache," which she rated as "8."  (Tr. 3344).  Dr. Choi diagnosed Harper with migraine without aura and without status migrainosus, not intractable, continued medication, and instructed her to follow up in two months.  (Tr. 3341).

On September 4, 2015, Harper again presented with headaches and associated symptoms of malaise/fatigue, as well as back pain.  (Tr. 3333).  Dr. Choi diagnosed her with migraine without aura and without status migrainosus, not intractable (primary diagnosis) and SAH.  (Tr. 3335).  He noted that Harper "[w]ill try fioricet" and continued her medication.  (*Id.*).  On October 14, 2015, Harper reported headaches, with associated symptoms of malaise/fatigue and nausea.  (Tr. 3321-22).  Dr. Choi determined that Harper had a "[t]ension-type headache, not intractable, unspecified chronicity pattern" and continued her medication.  (Tr. 3322-23).  On December 9, 2015, Harper

returned to follow up on her headaches.  (Tr. 3315).  Dr. Choi diagnosed her with migraine without aura and without status migrainosus, not intractable and prescribed Fioricet.  (Tr. 3317-18).  She also started taking Topamax.  (Tr. 3318).

On October 18, 2016, upon Dr. Choi's referral, Harper began receiving neurological treatment from Preetha Muthusamy, M.D.  (Tr. 4527, 4532).  Harper presented with complaint of brain aneurysm and SAH.  (Tr. 4527).  She was not taking Fioricet but instead treated her migraines with Topamax, Depakote, and Pamelor.  (Tr. 4528-30).  Harper reported chronic, throbbing, daily, all-day headaches predating her SAH, rating the pain at "8/10."  (Tr. 4528).  The headaches were associated with photophobia and phonophobia.  (*Id.*).  Dr. Muthusamy diagnosed Harper with intracranial aneurism and chronic migraine without aura, with intractable migraine, with status migrainosus.  (Tr. 4531).  Dr. Muthusamy noted that Harper was not responding to Depakote, so she would be weaned off of it, and would authorize Botox.  (*Id.*).  On March 2, 2017, Dr. Muthusamy administered a Botox injection.  (Tr. 4493, 4498).  At the visit, Harper reported her head pain as "8 on a scale of 0 to 10," and Dr. Muthusamy noted poor balance and tingling in Harper's fingers.  (Tr. 4493-94, 4497, 4502).

Meanwhile, on February 28, 2017, Harper underwent a cerebral angiogram, which revealed that her aneurysm was recurrent.  (Tr. 4732, 4734).  On April 25, 2017, she was admitted to the Cleveland Clinic to undergo third coil embolization.  (Tr. 4705-07).  The result of the procedure was "[p]artial occlusion of the residual left M1 aneurysm."  (Tr. 4707).  Harper was discharged on April 26, 2017.  (Tr. 4718).  Dr. Rasmussen indicated in the discharge note that Harper was neurologically intact and stable, and he continued her medication.  (Tr. 4718-19).

On June 16, 2017, Harper returned to Dr. Muthusamy for a second Botox injection.  (Tr. 4483).  Harper indicated she had suffered from headaches four days per week, and her current pain was eight out of ten.  (Tr. 4484, 4487).  Dr. Muthusamy reiterated Harper's migraine diagnosis,

noting that there was at least 40% improvement with Botox injection.  (Tr. 4488).  Dr. Muthusamy administered a second Botox injection, with an increased dose, and continued Harper's Pamelor and Topamax medication.  (Tr. 4488).  Dr. Muthusamy also prescribed Imitrex.  (Tr. 4488-89).

On July 11 ,2017, Harper presented to Dr. Rasmussen for an elective aneurysm coiling. (Tr. 4690).  The result was "[s]atisfactory placement of additional coils without daughter vessel embarrassment." (Tr. 4687).  A review of symptoms revealed no frequent or significant headaches and no neurological abnormalities.  (Tr. 4692-93).

On October 11, 2017, Harper returned to Dr. Muthusamy, reporting that she suffered at least 15 headaches per month, which as an improvement from every day.  (Tr. 4432-33).  The intensity of her pain also decreased to "5/10."  (Tr. 4432, 4437).  Dr. Muthusamy reiterated Harper's migraine diagnosis and administered a third Botox injection.   (Tr. 4437-38). Dr. Muthusamy continued Harper's Topamax and Imitrex medication and discontinued Pamelor. (Tr. 4438).

On March 6, 2018, Harper reported to Dr. Muthusamy that the previous Botox injections were helping, but she had not had a repeat Botox injection since October 11, 2017.  (Tr. 4665-66, 4670).  Harper stated her pain was "10/10." (Tr. 4666, 4670).  Dr. Muthusamy reiterated Harper's migraine diagnosis, administered a Botox injection, prescribed Imitrex nasal spray, and gave Harper a Medrol dose pack.  (Tr. 4670-71).  Dr. Muthusamy also continued Harper's Topamax medication, but noted that it wasn't helping much.  (Tr. 4671).

On May 29, 2018, Harper called Dr. Muthusamy to let her know she would be unable to come in on June 6, 2018 for another Botox injection because she was diagnosed with shingles. (Tr. 4961).  Harper returned to Dr. Muthusamy on July 17, 2018.  (Tr. 4944).  Harper indicated that as long as she was on Botox, it helped her headaches—reducing their intensity to "4-5/10" and allowed her to "function"—for three months.  (Tr. 4945).  She reported at the time of

appointment, however, 10/10 pain. (Tr. 4949). Dr. Muthusamy reiterated Harper's migraine diagnosis, administered a Botox injection, and prescribed Imitrex. (Tr. 4950).

On November 13, 2018, Harper returned for another Botox injection, reporting her pain as "10." (Tr. 5031, 5036). Dr. Muthusamy administered a Botox injection, prescribed Imitrex, and ordered a CT scan of Harper's head. (Tr. 5037). The CT scan showed no evidence of acute intracranial abnormality. (Tr. 5013). However, the CT scan indicated that there was "perhaps a tiny aneurysm." (*Id.*). Harper returned to Dr. Muthusamy on December 11, 2018 for a follow up, who referred Harper to neurosurgery. (Tr. 5017, 5022). Dr. Muthusamy stated that Harper's chronic migraine was "controlled on botox." (Tr. 5023).

##        2.       Mental Health Impairments

From November 2014 to August 2018, Harper received mental health treatment at Signature Health, Inc., from – among others – Laurie Mandel, NP. *See* (Tr. 3103-23, 3180-3271, 3535-3636, 3641-3742, 3767-3903, 4116-4325, 4538-4664, 4784-89, 4840-48). Specifically, Harper received treatment for: (1) dysthymic disorder; (2) opioid dependence; (3) cannabis dependence; (4) tobacco use disorder; (5) AXIS II: Deferred; (6) occupational problems; (7) housing problems; (8) economic problems; (9) healthcare-access problems; (10) legal problems; (11) psychosocial and environmental problems; and (12) anxiety disorder. (Tr. 4541-42).

On December 10, 2014, Harper reported to her therapist that her headaches were worsening. (Tr. 3119). On January 14, 2015, Harper reported that her headaches had gotten worse post-surgery. (Tr. 3122). On February 18, 2015, Harper started reporting to Nurse Practitioner Mandel that she suffered from headaches "all the time." (Tr. 3636).

On April 27, May 11, July 6, and August 17, 2015, Harper told Nurse Practitioner Mandel that she still had headaches all the time and was seeing a neurologist, but Fioricet was

not working.  (Tr. 3598-99, 3610, 3621).  On October 19, 2015, Harper continued to present with headaches and stated that a recent MRI detected no problems.  (Tr. 3580-81).  On November 18, 2015, Nurse Mandel prescribed Topamax for Harper's headaches.  (Tr. 3575).  On January 27, 2016, Nurse Mandel doubled the dosage of Topamax.  (Tr. 3561).

On February 29, 2016, Harper reported that her headache symptoms had improved with Topamax.  (Tr. 3540).  On March 30, 2016, Harper described her headaches as occasional and continued with Topamax.  (Tr. 3886, 3888).  On May 25, 2016, Nurse Practitioner Mandel noted that Harper had received a low dose of Depakote from a neurologist.  (Tr. 3866-67).  On July 11, 2016, Nurse Mandel still described Harper's headaches as occasional and that her symptoms had improved with Topamax and continued medication.  (Tr. 3845, 3847).

On July 27, 2016, Harper reported that she was "[v]ery upset about ongoing head-aches." (Tr. 3838).  Nurse Practitioner Mandel continued medication and instructed Harper to discuss her headaches with her neurologist.  (*Id.*).  On August 17, 2016, Harper presented with ongoing headaches, and Nurse Mandel continued medication.  (Tr. 3818).  On September 14, 2016, Nurse Mandel noted that Harper's neurologist had doubled her Depakote dosage.  (Tr. 3791-92).

On October 19, 2016, Harper reported to her therapist that she wanted to stop taking Depakote due to side effects.  (Tr. 3779).  She also indicated that she was suffering from headaches daily and was considering Botox treatment.  (*Id.*).  On October 26, 2016, Nurse Mandel Practitioner noted that Harper's neurologist had halved the dosage of Depakote and that Harper was going to start Botox treatment.  (Tr. 3771-72).

On November 30, 2016, Harper reported chronic headaches and Nurse Practitioner Mandel continued medication.  (Tr. 4311).  On January 3, 2017, Harper told her therapist that she had severe headaches and that her previous medication was not helping.  (Tr. 4296).  On January 11, 2017, Harper reported chronic headaches to Nurse Mandel and Mandel continued

8

medication.  (Tr. 4290).  On January 25, 2017, Harper told her therapist she was taking four ibuprofen every four hours to deal with her headaches and was unable to start Botox injections due to health insurance issues.  (Tr. 4282).

On February 13, 2017, Harper reported chronic headaches and that she had tried heroin for back pain relief – and overdosed.  (Tr. 4274-75).  Nurse Practitioner Mandel continued medication.  (Tr. 4275).  On March 14, 2017, Harper indicated that she started Botox injections and had gotten relief.  (Tr. 4258).  Nurse Mandel continued medication.  (*Id.*).

On May 5, 2017, Harper discussed with her counselor her constant headaches, indicating that she knew she would miss some appointments due to the amount of pain that she was in.  (Tr. 4196).  On June 19, 2017, Nurse Practitioner Mandel continued medication.  (Tr. 4169).  On August 3, 2017, Harper told her therapist that her medication and Botox was helping, as her headaches were not as bad.  (Tr. 4157).  On August 28, 2017, Nurse Mandel noted that Harper was recuperating well from her aneurysm surgery and continued medication.  (Tr. 4128).

On October 18 and November 29 and December 6 and 20, 2017, Harper reported chronic head pain.  (Tr. 4607-08, 4613-14, 4627, 4644).  Nurse Practitioner Mandel continued medication.  (*Id.*).  On February 5, 2018, Harper reported no back pain but was still taking Topamax and Nurse Mandel continued medication.  (Tr. 4583).  On March 3, 2018, Harper indicated that she wanted to wean off Topamax and reported ongoing migraines.  (Tr. 4559).  Nurse Mandel weaned her off Topamax.  (*Id.*).

On March 27, 2018, Harper reported to her therapist that she had completed a series of Botox injections.  (Tr. 4548).  They were "very helpful, but it doesn't take the pain away completely.  I am always in pain at some level."  (*Id.*).  Nurse Practitioner Mandel's last available record were from August 29, 2018, in which Harper reported no headaches but was continuing to take Topamax and receiving Botox injections for migraines.  (Tr. 4788-89).  Her

counseling records through October 4, 2018, did not mention her headaches.  (Tr. 4842, 4844-45, 4848).

## C.    Relevant Opinion Evidence

### 1.    Physical Impairments

On October 30, 2014, state agency consultant Gerald Klyop, M.D., evaluated Harper's physical capacity based on a review of the medical record through September 22, 2014 and determined that Harper had the physical residual functional capacity ("RFC") to perform medium work.  (Tr. 87-88, 92).[3]  Specifically, Dr. Klyop stated that Harper could lift/carry 50 lbs. frequently and 25 lbs. occasionally; (2) stand/walk for 6 hours in an 8-hour workday; and (3) push and pull without limitation, other than those related to her ability to lift/carry.  (Tr. 87). She otherwise had no postural, manipulative, visual, communicative, or environmental limitations.  (*Id.*).  On April 22, 2015, Leon Hughes, M.D., concurred with the physical functional assessments in Dr. Klyop's opinion.  (Tr. 138-39, 142).

### 2.    Mental Impairments

#### a.    Treating Nurse Practitioner – Laurie Mandel, NP

On August 13, 2018, Nurse Practitioner Mandel prepared a form "Off-Task/Absenteeism Questionnaire."  (Tr. 4740).  Nurse Mandel stated that Harper would likely be off-task at least 20% of the time, exclusive of a half-hour lunch break and two 15-minute breaks.  (*Id.*).  In support, Nurse Mandel cited Harper's "chronic pain, migraine headaches, depression, [and] anxiety."  (*Id.*).  She further indicated that Harper was unable to concentrate, pay attention, and/or focus on a sustained basis because of "O/t Migraine Headaches and chronic pain at

---

[3] The state agency consultants prepared identical reports for each of Harper's applications. *See* (Tr. 78-125, 129-60, 164-79).  For ease of reference, I will make reference only to their report on Harper's DIB application.

times," specifically pain in Harper's head, bilateral legs, and back.  (*Id.*).  Nurse Mandel expected Harper to be absent from work about four times per month.  (*Id.*).  Nurse Mandel closed by stating that the severity of Harper's limitations existed since at least March 31, 2015, continuing through the present.  (*Id.*).

Nurse Practitioner Mandel also prepared a "Stroke/Vascular Insult to Brain Medical Source Statement," stating that Harper had a stroke as well as depression, anxiety, migraine headaches, and chronic pain.  (Tr. 4741)  Nurse Mandel indicated Harper suffered from balance problems, poor coordination, weakness, unstable walking, falling spells, pain/fatigue, nausea, vertigo/dizziness, headaches, difficulty remembering, confusion, depression, emotional lability, difficulty solving problems, poor judgment, and shaking tremors.  (*Id.*).  Nurse Mandel stated that Harper had marked limitations persisting for at least three consecutive months after the insult in her ability to: (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manager herself.  (*Id.*).

Nurse Practitioner Mandel further opined that Harper could not walk a city block without rest; sit for any length of time continuously at 1 time; stand for more than 5 minutes continuously at 1 time; stand/walk for more than 15 minutes in an 8-hour workday; or sit for more than 4 hours in an 8-hour workday.  (Tr. 4741-42)  Harper needed to shift positions at will from sitting, standing, or walking; needed unscheduled breaks "[a]ll the time" for between "2-3 hours" before returning to work, during which she needed to lie down or sit quietly; occasionally lift less than 10 lbs.; could stoop/crouch 10% of the time in an 8-hour workday; and could grasp, turn, manipulate, and reach only 50% of the time in an 8-hour workday.  (Tr. 4742)  Nurse Mandel reiterated her opinion that Harper would be off-task 20% of the time, absent from work 4 times per month, and had an inability to concentrate, pay attention, or focus on a sustained basis, but did not cite any underlying condition in support.  (Tr. 4173)  She only noted pain in Harper's

11

head, back, and bilateral legs.  (*Id.*).  Nurse Mandel added that "[d]ue to hx of migraine headaches, anxiety, and depression and chronic neck pain[,] I don't foresee this patient to be able to work 8 hours/per day, 5 days a week."  (*Id.*).

Last, Nurse Practitioner Mandel prepared a "Medical Statement Concerning Depression, Bipolar, and Related Disorders," noting that Harper had DSM IV/V diagnoses of chronic pain; migraines; depression; and anxiety.  (Tr. 4744)  Nurse Mandel opined that Harper only had *mild* limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace at tasks; and adapt or manage herself.  (*Id.*).  Nurse Mandel maintained that the severity Harper's limitations existed before March 31, 2015, continuing through the date of her opinion.  (*Id.*).  All three opinions were signed by Nurse Mandel and Kristen Kelley, LPN.  (Tr. 4740, 4743-44).

### 3.    State Agency Consultants

On November 20, 2014, Cindy Mantyi, Ph.D., evaluated Harper's mental capacity based on a review of the medical record.  (Tr. 85-86, 88-90).  As relevant here, Dr. Mantyi stated that Harper had understanding and memory limitations, but Harper was not significantly limited in her ability to remember locations and work-like procedures or very short and simple instructions. (Tr. 88).  She was moderately limited in her ability to understand and remember detailed instructions.  (*Id.*).  Dr. Mantyi explained that Harper was "[d]epressed, anxious, [and] ruminative.  Condition restricts capacity for detailed complex tasks, but she is able to comprehend, remember, and carry out simple (1-2 step) and occasional complex (3-4) step instructions."  (Tr. 88-89).

Dr. Mantyi opined that Harper had sustained concentration and persistent limitations. (Tr. 89).  Specifically, Harper was not significantly limited in her ability to carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions.  (*Id.*).  Harper was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to otherwise without being distracted; and complete a normal workday/workweek without interruption and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*).  Dr. Mantyi explained that Harper was

> "[d]epressed [and] anxious.  Panics around others and is worried about her health.  Concentration and pace variable.  Somatic focus serves to magnify her sx, thereby impinging upon sustainability.  Nonetheless, she can maintain attention, make simple decisions, and adequately adhere to schedule.  She would need some flexibility in terms of time limits and production standards.

(*Id.*).  On February 11, 2015, Paul Tangeman, Ph.D., concurred with Dr. Mantyi's assessment.  (Tr. 136, 139-41).

### D.    Relevant Testimonial Evidence

Harper testified at the October 24, 2018 ALJ hearing.  (Tr. 41-67).  What prevented her from working were daily migraines and back issues.  (Tr. 51-53).  Because of the migraines, she sometimes couldn't leave the house.  (Tr. 51).  The migraines were constant, causing pain at a nine on a scale of ten.  (Tr. 53).  At the hearing, she felt the beginnings of a migraine due to the lights, with a pain of seven.  (*Id.*).  She sometimes missed doctors' appointments because of migraines and sunlight.  (Tr. 64).  Harper received Botox injections around every 90 days for her migraines and took over the counter medication for her back.  (Tr. 51-52).  The Botox injections helped "[a] little bit.  Enough that it is worth doing."  (Tr. 51, 59).  She also took Imitrex.  (Tr. 52).

Harper testified that she knew that the coils for her aneurysm had collapsed because it worsened her headaches.  (Tr. 54-55).  She also attributed to her aneurysm memory problems.  (Tr. 55).  She would write things down and then forget them.  (Tr. 63-64).  Since the SAH, she's

13

taken one- to four-hour naps at random times every day – usually after she had a migraine headache.  (Tr. 56, 59-60).  Dr. Muthusamy told Harper that her headaches were because of blood in her head due to the aneurysm, which had not been fully extracted.  (Tr. 57).  When she felt a migraine in spite of the Botox, she would take Imitrex and something for nausea, as well as darken the room and wear a cold washcloth over her eyes.  (Tr. 59).  Nurse Mandel prescribed her Topamax for her headaches and she spoke to Nurse Mandel about her problems.  (Tr. 61).

Harper further testified that she couldn't read because of her headaches.  (Tr. 65-66).  She also could not finish a movie because she would fall asleep.  (Tr. 66).  So, at best, she could only perform tasks for short periods of time.  *Id.*  Her hand tremors were also the result of her aneurysm.  (Tr. 67).

### III.    The ALJ's Decision

On February 25, 2019, the ALJ issued a written decision denying Harper's claim.  (Tr. 15-26).  The ALJ made the following paraphrased findings relevant to Harper's arguments in this case:

1.  The date last insured was March 31, 2015.  (Tr. 18).

3.  The prescribed period for her DWB benefits ended on January 31, 2019.  (*Id.*).

5.  Harper had the severe impairments of: disorders of the nervous system (brain aneurysm), depressive disorder, and anxiety disorder.  (*Id.*).

Harper also had a history of right fibula fracture, a history of migraine headaches, degenerative disc disease of the lumbar spine, Hepatitis C, obesity, and substance addiction disorder.  However, these impairments were not severe because they would have no more than a minimal effect of Harper's ability to perform basic work activities (Exhibits 12F, pp. 15, 35 [(Tr. 3138, 3158)]; 20F, p. 7 [(Tr. 3749)]; 23F, pp. 4, 6 [(Tr. 4011, 4013)]; 27F, pp. 3-4, 16, 21-22 [(Tr. 4087-88, 4100, 4105-06)]; 29F, pp. 7, 11, 34, 38, 46 [(Tr. 4332, 4336, 4359, 4363, 4371)]; 30F, pp. 14, 77-78 [(Tr. 4418, 4481-82)]; 35F [(Tr. 4748-55)]; 41F, pp. 22, 24 [(Tr. 4870, 4872)]; 43F, p. 5 [(Tr. 4945)]).  (Tr. 18).

6.  Harper had no impairment or combination of impairments that met or medically equaled the severity of the listed impairments.  (*Id.*).

7.   Harper had the RFC to perform medium work except: lifting/carrying 50 lbs. occasionally and 25 lbs. frequently; sitting/standing/walking 6 hours in an 8-hour workday; and pushing/pulling as much as she could lift/carry.  Harper was limited to simple, routine tasks with no strict production rate and pace requirements; could interact with supervisors, coworkers, and the public occasionally; and was limited to routine workplace changes, and any other changes had to be explained in advance and introduced gradually.  (Tr. 20).

[A]fter careful consideration of the evidence, the ALJ found that Harper's medically determinable impairments could be reasonably expected to cause the alleged symptoms; however, her statements concerning their intensity, persistence, and limiting effects were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 22).

As for the opinion evidence, great weight was given to the state agency physical capacity assessments of Dr. Klyop and Dr. Hughes, who found that she could perform a range of medium work.  Partial weight was given to the mental capacity assessments of Dr. Matyi and Dr. Tangeman.  Their observation that Harper had moderate difficulties in social functioning and concentration, persistence, and pace, as well as their opinion regarding Harper's ability to perform simple, routine tasks was supported by the evidence.  Contrary to their other conclusions, the evidence established that Harper was able to interact with supervisors, coworkers, and the public.  (*Id.*).

. . . Little weight was given to Nurse Mandel's and Nurse Kelley's three opinions. The Off Task/Absenteeism medical source statement, in which they noted that Harper would be off task at least 20% of the time and absent about four times a month "due to the claimant's chronic migraine headaches, depression and anxiety but such opinions are speculative and not supported by the overall evidence in the record (Exhibit 34F, p. 2 [(Tr. 4740)])."  As for the Stroke/Vascular Insult to the Brain medical source statement, their physical limitations were inconsistent with Harper's treatment records and their non-exertional limitations were internally inconsistent with the medical source statement, in which they noted that Harper had mild limitations (Exhibit 34F, pp. 3-5 [(Tr. 4741-43)]).  The medical source statement concerning Depression, Bipolar, and Related Disorders was likewise internally inconsistent with the Stroke/Vascular Insult to the Brain medical source statement (Exhibit 34F, p. 6 [(Tr. 4744)]).  (Tr. 23).

In sum, the evidence supported the above-stated RFC.  (*Id.*).

12.   Considering Harper's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform, such as cleaner, packer, and laundry worker.  (Tr. 24-25).

Based on these findings, the ALJ determined that Harper was not disabled.  (Tr. 25).

IV.     **Law & Analysis**

      A.     **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.");  *Rabbers v.*

16

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

B.        **Step Two – Headaches as a Severe Impairment**

Harper argues that the ALJ failed to reach a decision supported by substantial evidence when he determined that her migraine headaches were not a "severe" impairment.  ECF Doc. 15 at 6; ECF Doc. 18 at 1.  She argues that the error is not harmless because the ALJ did not consider her migraine headaches at any subsequent step of the sequential evaluation.  ECF Doc. 18 at 1.  Specifically, the ALJ's Step-Four analysis – she contends – did not cite or discuss her testimony regarding and treatment with Dr. Muthusamy for migraine headaches.  ECF Doc. 15 at 17-18.

The Commissioner responds that any error in the ALJ's Step Two evaluation of Harper's migraine headaches was not reversible error because the ALJ to proceeded through the remaining steps of the sequential analysis to evaluate all of her alleged impairments.  ECF Doc. 17 at 6-7.

1.        **Step Two Standard**

At the second step of the sequential analysis, the ALJ considers whether the claimant has a "severe impairment."  20 C.F.R. § 416.920(a)(4)(ii).  Step two is a threshold inquiry "intended to screen out totally groundless claims."  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quotation marks omitted).  Thus, an impairment qualifies as a "severe impairment" only if it is "expected to result in death [or has] lasted or is expected to last for a continuous period of at least 12 months."  20 C.F.R. §§ 416.909, 416.920(a)(4)(ii).

The Sixth Circuit applies a *de minimis* standard to the Step Two inquiry, meaning that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) (citations omitted).  If the ALJ determines that the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find

that the claimant is not disabled. 20 C.F.R. § 416.920(c). Conversely, if "an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 577 (emphasis in original) (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)). So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Id.* (citation omitted).

## 2. Analysis

I agree with the Commissioner that any error the ALJ may have made in determining that Harper's migraine headaches were not a severe impairment was harmless. The ALJ stated that he considered all of Harper's physical and mental impairments and their symptoms at later steps in the sequential analysis. (Tr. 18-22). That included her migraine headaches. For instance, at Step Three, the ALJ specifically cited Nurse Practitioner Mandel's February 29, 2016 treatment notes – in which Nurse Mandel observed that Harper was alert and oriented, had linear thought process, and intact memory – to support his finding that she had moderate limitation in concentrating, persisting, or maintaining pace. (Tr. 20 (citing (Tr. 3643)). In that same progress note, Nurse Mandel noted Harper's migraine headache diagnosis, stating that Harper's headaches had improved with Topamax. (Tr. 3646). At Step Four, the ALJ noted in his discussion of Harper's mental impairments that Harper had been treated with Topamax, which Harper had been prescribed by – among others – Nurse Mandel to treat her headaches as early as November 18, 2015. (Tr. 22); *see* (Tr. 3559, 3561, 3573-75, 3665, 3667, 3679, 3681, 3770-72, 3845, 3847, 3886, 3888, 4126, 4128, 4168-69, 4228, 4230, 4256, 4258, 4273-75, 4289-90, 4625, 4627). And the ALJ expressly rejected Nurse Mandel's opinion that Harper's migraine headaches would –

with her other impairments – cause Harper to be off task at least 20% of the time and four times a month and cause marked limitations in her cognitive functioning.  (Tr. 23).

Because the ALJ considered Harper's migraine headaches at later steps of the sequential analysis, any error the ALJ might have committed in finding that Harper's migraine headaches were non-severe was harmless.  *See Nejat*, 359 F. App'x at 577.  Accordingly, no remand based on Harper's Step Two challenge is warranted.

### C.        Step Four – Subjective Symptom Complaints

Harper argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in evaluating her subjective symptom complaints regarding her chronic migraines.  ECF Doc. 15 at 10; ECF Doc. 18 at 3.  Specifically, she contends that the ALJ failed to connect his summary of her statements or medical evidence with his finding that her subjective complaints of migraine pain should be discounted; compare her statements to the factors articulated in SSR 16-3p; or cite specific medical records to support his decision.  ECF Doc. 15 at 14.  Harper argues that her statements regarding her migraines were fully consistent with the medical evidence (Dr. Muthusamy's treatment notes, radiological evidence of additional aneurysms, and the ALJ's description of her aneurysm treatment).  *Id.*  The ALJ, she asserts, should therefore have found that her symptoms were more likely to reduce her capacity to perform work-related activities.  *Id.*

The Commissioner responds that the ALJ evaluated Harper's pain complaints as part of the symptom evaluation process under the regulations, including her subjective symptom complaints, the objective medical evidence, her treatment history, the medical opinions, and her activities of daily living.  ECF Doc. 17 at 13.  The Commissioner argues – it seems – that the ALJ's consideration of her substance-use history was evidence that the ALJ considered her treatment for headaches and the impacts her headaches had on her daily living.  *Id.*  The

20

Commissioner further asserts that Harper failed to point to evidence showing that her headache symptoms were so significant as to prevent her from carrying out activities daily activities or that she underwent significant treatment for headaches.  *Id.*

###### 1.    Step Four Standard

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  The regulations prescribe a two-step process for evaluating subjective symptom complaints.  20 C.F.R. § 404.1529(a).  The ALJ must first determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms.  *Id.*  If there is, the ALJ must then evaluate the intensity, persistence, and limiting effects of those symptoms on the claimant's ability to do basic work activities.  *Id.*; SSR 16-3p, 2016 SSR LEXIS 4 *4 (Mar. 16, 2016).  In evaluating a claimant's subjective symptom complaints, an ALJ must consider – to the extent that they are implicated by the record – the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate symptoms; the claimant's efforts to alleviate her symptoms; and any other factor concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 SSR LEXIS 4 *18-19; 20 C.F.R. § 416.929(c)(3).

An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's statements about her symptoms when they are inconsistent with objective medical and other evidence.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also* SSR 16-3p, 2016 SSR LEXIS 4 *15 (Mar. 16, 2016) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other

evidence.").  If consistent with the objective medical evidence and other evidence of record, then the ALJ must determine that the claimant's symptoms are more likely to reduce her capacity to work and vice versa.  SSR 16-3p, 2016 SSR LEXIS 4 *20 (Mar. 16, 2016).

If an ALJ discounts or rejects a claimant's subjective complaints, he must clearly state his reasons for doing so.  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Specifically, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess" how the ALJ evaluated the claimant's symptoms.  SSR 16-3p, 2016 SSR LEXIS 4 *26 (Mar. 16, 2016).  Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).  While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

## 2.    Analysis

The ALJ failed to apply proper legal standards in evaluating Harper's subjective symptom complaints related to her migraine headaches because he failed to provide sufficiently clear reasons for discounting her complaints.  Several aspects of the ALJ's subjective symptom analysis give the court pause.  Harper is correct that the ALJ's subjective symptom analysis did not expressly mention her chronic migraine headaches, explicitly compare her statements regarding the limiting effect of her migraines to the relevant factors or cite to her migraine-

specific treatment records.  (Tr. 21-22).  The ALJ stated simply that Harper alleged disability on account of "aneurysm residuals" – without explaining what those were – and "mental impairments" (of which he mentioned only anxiety and depression) and summarized *some* of the over 5000 pages of medical evidence related to her aneurysm and mental health treatment.  (*Id.*).

It's unclear where Harper's migraine headaches fell within that framework.  On the one hand, Harper testified that her migraine headaches were derivative of her aneurysm, so they could be seen as part of "aneurysm residuals."  (Tr. 57).  And that would be consistent with Dr. Choi's and Dr. Rasmussen's records treating migraine headaches as a secondary diagnosis to Harper's SAH.  (Tr. 831, 3362-63, 3369, 3371, 3374-75, 3379, 3381, 3383).  On the other hand, her migraine headaches predated her SAH and was a distinct diagnosis for which she received specialized treatment.  (Tr. 530, 3322-23, 3335, 3340-41, 4528, 4531, 4488, 4437, 4669, 4950).  And Harper did – for a time – only receive treatment from Nurse Practitioner Mandel for her migraine headaches.  (Tr. 3559, 3561, 3573-75, 3665, 3667, 3679, 3681, 3770-72, 3845, 3847, 3886, 3888, 4126, 4128, 4168-69, 4228, 4230, 4256, 4258, 4273-75, 4289-90, 4625, 4627).  The ALJ did, however, mention in his discussion of her mental-health impairments that she was treated with Topamax, so it appears to have been considered there.  (Tr. 22).

What is missing from the ALJ's evaluation of Harper's chronic migraines?  For one, there's no acknowledgment of the relevant factors or discussion of Harper's daily activities; the location, duration, frequency, or intensity of her migraine headaches; the effectiveness of Harper's treatment for chronic migraines; any measures taken by Harper to relieve her pain; and the limiting effects of her migraines.  (Tr. 21-22); *Renstrom*, 680 F.3d at 1067; SSR 16-3p, 2016 SSR LEXIS 4 *18-19 (Mar. 16, 2016).  And aside from mentioning Topamax in his subjective symptom analysis, the ALJ never discussed these factors in connection with Harper's migraine headaches anywhere in his opinion.  *See* (Tr. 18-25).

What's more, the ALJ gave only a boilerplate conclusion after his short summary:

> Therefore, after careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.

(Tr. 22).  The Sixth Circuit has condemned this kind of language as "unhelpful and poorly worded," expressing its concern that the popularity of this template "is the risk that an ALJ will mistakenly believe it sufficient to *explain* a credibility finding, as opposed to merely . . . summarizing one." *Cox v. Comm'r of Soc. Sec.*, 615 Fed. App'x 254, 259-60 (6th Cir. 2015) (emphasis in original).[4]

I find, as the *Cox* court did, that "[t]he ALJ's discussion of the evidence does not permit [the court] to reasonably infer a sufficient explanation for [his] [subjective symptoms]." *Id.* at 261.  The ALJ's passing reference to "chronic migraines" in his discussion of Nurse Practitioner Mandel's opinion isn't enough because Nurse Mandel's opinion cited multiple impairments in support, not just Harper's migraine headaches.  *Mace v. Comm'r of Soc. Sec.*, No. 1:19-cv-1502, 2020 U.S. Dist. LEXIS 223130, at *9 (Nov. 30, 2020 N.D. Ohio); (Tr. 4740-41, 4173).  For that reason, the error is not harmless.  *Cox*, 615 F. App'x at 257 ("The error is not harmless where it obstructs meaningful review of the ALJ's decision." (citation omitted)).  The error also is not harmless because Harper testified that she took one- to four-hour naps at random after a migraine headache, which she had daily, and the vocational expert testified that such an individual could not sustain employment.  (Tr. 53, 56, 59-60, 74).  Moreover, the ALJ's decision failed to "build

---

[4] The boilerplate language at issue in *Cox* was:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

615 F. App'x at 259-60.

an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Because the ALJ's discussion of why he discounted Harper's subjective symptom complaints regarding her migraine headaches was inadequate, I recommend that this matter be remanded to the ALJ for an analysis of Harper's subjective symptoms that fully complies with SSA regulations.

**D.      Step Four – Physical RFC**

Harper last argues that the ALJ's physical RFC finding was not supported by substantial evidence because it was based on outdated opinion evidence.  ECF Doc. 15 at 15.  Specifically, she argues that the ALJ could not rely on the opinions of Dr. Klyop and Dr. Hughes that she could perform medium work because they did not have the benefit of medical evidence that entered the record after they rendered their opinion, such as her subsequent aneurysms and surgeries.  ECF Doc. 15 at 16-17; ECF Doc. 18 at 2.  Harper contends that under *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), the ALJ cannot interpret raw data – which may arise where the ALJ makes an RFC determination based on outdated opinions that did not include consideration of a critical body of objective medical evidence.  ECF Doc. 15 at 16.  As an extension of *Deskin*, Harper argues that under *Falkosky v. Comm'r Soc. Sec.*, No. 1:19-cv-2632, 2020 U.S. Dist. LEXIS 165462 (N.D. Ohio Sept. 10, 2020), the ALJ had a duty to more fully develop the record once he chose to reject the opinion evidence that she presented.  ECF Doc. 15 at 17-18; ECF Doc. 18 at 2.

The Commissioner responds that the ALJ specifically discussed evidence post-dating Dr. Klyop's and Dr. Hughes's opinions, such that the ALJ clearly had the post-opinion evidence in mind in fashioning the RFC.  ECF Doc. 17 at 9-10.  The Commissioner argues that even if *Deskin* were binding law, it wouldn't compel reversal because the post-opinion evidence did not

25

show worsening of her symptoms or limitations but was instead similar to what the state agency consultants had available to them.  ECF Doc. 17 at 10-11.  The Commissioner argues that the ALJ had no further duty to develop the record because Harper was counseled, and she failed to present evidence indicating that additional record development was necessary.  ECF Doc. 17 at 11-12.

### 1.    Law

The ALJ has a basic obligation to develop a full and fair record.  *Lashley v. Sec'y of Health and Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983).  That obligation rises to a special duty where the claimant is proceeding *pro se*.  *Id.*  But the Sixth Circuit has repeatedly held that the ALJ's duty to develop the record does not require the ALJ to order a consultative examination.  *Cox*, 615 F. App'x at 263 (collecting cases).

In *Deskin*, the court was presented with an ALJ's RFC assessment when there was only one medical opinion from a state agency reviewing physician without the benefit of two years of post-opinion medical evidence.  605 Fed. Supp. 2d at 909-10.  The court stated that there was cause for concern that substantial evidence may not exist to support an RFC assessment when: (1) there was no medical opinion evidence as to the claimant's functional capacity; or (2) the RFC was based on a medical opinion made "without the benefit of review of a substantial amount of the claimant's records."  *Id.* at 911.  Thus, the court held that:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.  This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

*Id.* at 912 (citation and quotation marks omitted).

This Court later clarified that "*Deskin* sets out a narrow rule that does not constitute a bright-line test.  It potentially applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a body of objective medical evidence."  *Kizys v. Comm'r of Soc. Sec'y*, No. 3:10-cv-25, 2011 U.S. Dist. LEXIS 122296, at *4 (N.D. Ohio Oct. 21, 2011).

The precedential value of *Deskin* is a touchy subject within the Northern District of Ohio. *Adams v. Colvin*, No. 1:14-cv-2097, 2015 U.S. Dist. LEXIS 102588, at *38 (N.D. Ohio Aug. 5, 2015) (noting the criticism of *Deskin* by other members of the court).  One decision found that *Deskin* "is not representative of the law established by the legislature and interpreted by the Sixth Circuit."  *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 U.S. Dist. LEXIS 18644, at *4 (N.D. Ohio Mar. 2, 2010).  The state of things now is that *Deskin* isn't controlling and serves only as persuasive authority[5].  *Falkosky*, No. 1:19-cv-2632, 2020 U.S. Dist. LEXIS 165462, at *15.

However, in *Falkosky*, this court determined  that *Deskin* and its progeny suffice to establish that "in some circumstances, an ALJ *is* required to obtain a medical opinion in furtherance of his 20 C.F.R. § 404.1545(a)(3) responsibility to develop the record."  *Id.* (emphasis in original).  And because *Deskin* was directly applicable to the case, *Falkosky* determined that *Deskin* should not be ignored.  *Id.*  The *Falkosky* ALJ made an RFC determination despite opinion evidence that there was insufficient evidence upon which to make an RFC finding and no medical evidence that discussed the claimant's functional limitations.  *Id.* at *16-19.  Because the ALJ had no medical opinions on the claimant's functional abilities and because the ALJ's RFC finding was based on the ALJ's lay conclusion concerning Falkosky's

---

[5] A decision by one judge in a judicial district is never controlling authority in a case presided over by another judge in that district.

reported symptoms, the court concluded that the ALJ had a duty to more fully develop the record.  *Id.* at *20-24.

### 2.     Analysis

First, the ALJ did not err by relying on Dr. Klyop's and Dr. Hughes's opinions.  In the Sixth Circuit, the ALJ may rely on the opinion of a consulting physician who did not have the opportunity to review later-submitted medical records, so long as there is "some indication" that the ALJ at least considered the fact that the opinions were outdated before assigning them greater weight.  *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493-94 (6th Cir. 2016) (quotation marks omitted).  The ALJ noted the date of Dr. Klyop's and Dr. Hughes's opinions, and in his summary of the evidence discussed Harper's medical records relating to her aneurism treatment through December 11, 2018.  (Tr. 21-22 (citing Tr. 5013, 5022)); *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  Thus, there is at least some indication that the ALJ considered Harper's post-opinion aneurysm treatment records before he assigned Dr. Klyop's and Dr. Hughes's opinions great weight.  *See Spicer*, 651 F. App'x at 493-94; *see also Van Pelt v. Comm'r of Soc. Sec.*, Case No. 1:19-cv-2844, 2020 U.S. Dist. LEXIS 244781, at *33 (N.D. Ohio Dec. 30, 2020); *Jacks v. Comm'r of Soc. Sec.*, No. 3:15-cv-309, 2017 U.S. Dist. LEXIS 19229, at *13-14 (S.D. Ohio Feb. 10, 2017).

As for *Deskin*, it isn't controlling.  *Falkosky*, No. 1:19-cv-2632, 2020 U.S. Dist. LEXIS 165462, at *15.  Nor is it implicated on the facts of this case.  *Deskins* concerned an ALJ RFC determination based on a record that contained only a single, outdated medical opinion.  605 F. Supp. 2d at 910.  Conversely, the ALJ in this case had two opinions – those of Dr. Klyop and Dr. Hughes – and Nurse Practitioner Mandel's three August 13, 2018 opinions.  (Tr. 22-23).  The ALJ discounted Nurse Mandel's assessment of Harper's physical limitations, instead giving greater weight to those of the state agency consultants.  (*Id.*).  This court has discussed the

difference between those two situations. In the former, the ALJ had post-opinion evidence that didn't discuss the claimant's functional limitations, and the ALJ erred by determining functional limitations based on the raw medical data. *Kizys*, No. 3:10-cv-25, 2011 U.S. Dist. LEXIS 122296, at *6-7; *Deskin*, 605 F. Supp. 2d at 912. In the latter situation, the ALJ had multiple medical source opinions that served as "a guide to peg a residual functional capacity." *Kizys*, No. 3:10-cv-25, 2011 U.S. Dist. LEXIS 122296, at *5. And "an ALJ may disregard a treating physician's opinion as to limitations in favor of that of another medical source, provided that the ALJ gives good reasons for doing so." *Id.* Thus, the ALJ wasn't required to further develop the record under *Deskins.* And we need not address the ALJ's evaluation of the opinion evidence here because Harper has expressly disclaimed any such challenge. ECF Doc. 15 at 18 n.7 ("Harper does not challenge the ALJ's evaluation of [Nurse Mandel's] opinions."); *United States v. Olano*, 507 U.S. 725, 733 (1993).

Upon careful consideration of the record, Harper has not demonstrated that the ALJ failed to apply proper legal standards or reach a conclusion supported by substantial evidence in how he evaluated the opinions of doctors who rendered opinions without the benefit of later, critical medical records. And thus, on this ground, I can find no error in how the ALJ formulated Harper's physical RFC.

## V.     Recommendation

Because the ALJ failed to apply proper legal standards in evaluating Harper's subjective symptom complaints, I recommend that the Commissioner's final decision denying Harper's applications for DIB, DWB, and SSI be vacated and that Harper's case be remanded for further consideration.

Dated: May 25, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).